UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-13413-RGS

VICTOR GERMAN,
Petitioner

v.

YALERSI GOMEZ LOPEZ,
Respondent

MEMORANDUM AND ORDER
CONCERNING A HAGUE CONVENTION PETITION

November 19, 2015

STEARNS, D.J.

This case is before the court on a petition brought by Victor German (Victor) pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention) and the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9003. Victor[1] seeks the return to the Dominican Republic of his two minor daughters, D, age 4, and K, age 3, who were taken to the United States, allegedly without his permission,

---

[1] For clarity, the court will use the first names of the parents.

by their mother, Victor's then wife, respondent Yalersi Gomez Lopez (Yalersi).[2]

*Procedural Background*

The procedural background is brief. On November 11, 2014, Victor submitted a Request for Return of his children to the Central Authority of the Dominican Republic, the National Council for the Childhood and Adolescence (CONANI).[3] On December 2, 2014, CONANI forwarded the request to the U.S. Department of State. On March 23, 2015, an official at the Department of State wrote to Yalersi notifying her of the request and of the duty of the United States under Article 7(f) of the Hague Convention to facilitate, if necessary, the initiation of judicial proceedings. On September 22, 2015, Victor filed a Petition for Return in the District of Massachusetts, the jurisdiction where Yalersi and the two girls now reside. On October 5, 2015, the Department of State made a formal request that the court act expeditiously on the petition.

On October 20, 2015, the court appointed Janice Bassil, Esq., to represent the interests of the children and scheduled an initial appearance for November 3, 2015. On October 23, 2015, the court issued an order requiring Yalersi to appear at the November 3, 2015 hearing, and enjoining her from

---

[2] The Dominican Republic ratified the Hague Convention in 2004.

[3] The Hague Convention requires signatory States to designate a "Central Authority" to process and coordinate Requests for Return.

2

removing the children from the jurisdiction of the court. The order was served on Yalersi by a U.S. Marshal that same day.

At the hearing, Elizabeth Abimola Thomas, Esq., entered a *pro bono* appearance for Yalersi. With the parties' agreement, the court scheduled an evidentiary hearing for November 10, 2015. At the hearing, the court heard the testimony of Yalersi, and through the video conferencing auspices of the U.S. Embassy in Santo Domingo, that of Victor.[4] Family members also testified.

*Legal Background*

The Hague Convention requires the prompt return of children who have been wrongfully taken from the State in which they habitually reside. *Chafin v. Chafin*, 133 S.Ct. 1017, 1021 (2013). The resolution of a Hague Convention petition "begin[s] and end[s] with the question of [a child's] habitual residence at the time of removal." *Mendez v. May*, 778 F.3d 337, 344 (1st Cir. 2015). If the State from which a child is taken is not his or her habitual residence, there is no remedy under the Hague Convention. The determination of a child's

---

[4] Because Victor had been previously deported from the United States, he could not appear personally at the hearing.

3

place of "habitual residence" also decides the State whose courts have jurisdiction to make custody decisions regarding the child.[5]

In the First Circuit, a district court presented with a Hague Convention petition is to look first "to the shared intent or settled purpose of the persons entitled to determine the child's permanent home; as a secondary factor, [the court] may consider the child's acclimatization to his or her current place of residence."[6] *Mendez*, 778 F.3d at 344. In parsing the parents' settled purpose, a court is to "'look specifically to the last moment of the parents' shared intent.'" *Id.*, quoting *Mauvais*, 772 F.3d at 12. A petitioner seeking the return of a child under the Hague Convention must establish by a preponderance of the evidence "that he or she (1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights." *Mendez*, 778 F.3d at 343.

---

[5] *See* Jeff Atkinson, *The Meaning of "Habitual Residence" under the Hague Convention on the Civil Aspects of International Child Abduction and the Hague Convention on the Protection of Children*, 63 Okla. L. Rev. 647, 648 (2011).

[6] Acclimatization is "rarely, if ever, a significant factor when children are very young." *Neergard-Colón v. Neergard*, 752 F.3d 526, 533 (1st Cir. 2014). Inquiry into acclimatization occurs only if the respondent produces evidence that the children's lives are so embedded in the new country as to overcome the parties' past shared intent as to place of residence. *Mauvais v. Herisse*, 772 F.3d 6, 14 (1st Cir. 2014). Notwithstanding, "evidence of acclimatization is generally insufficient 'to establish a child's habitual residence in a new country when contrary parental intent exists.'" *Id.*, quoting *Darín v. Olivero-Huffman*, 746 F.3d 1, 12 (1st Cir. 2014).

> Custody decisions are often difficult. Judges must strive always to avoid a common tendency to prefer their own society and culture, a tendency that ought not interfere with objective consideration of all the factors that should be weighed in determining the best interests of the child. This judicial neutrality is presumed from the mandate of the Convention, which affirms that the contracting states are "[f]irmly convinced that the interests of children are of paramount importance in matters relating to their custody." Convention Preamble, Treaty Doc., at 7. International law serves a high purpose when it underwrites the determination by nations to rely upon their domestic courts to enforce just laws by legitimate and fair proceedings.  To interpret the Convention to permit an abducting parent to avoid a return remedy . . . would run counter to the Convention's purpose of deterring child abductions by parents who attempt to find a friendlier forum for deciding custodial disputes.

*Abbott v. Abbott,* 560 U.S. 1, 20 (2010).

There are exceptions.  One is Article 13(b) of the Convention: "[A] court is not bound to order the return of the child if there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  The respondent must show a grave risk of potential harm by clear and convincing evidence.[7]  22 U.S.C. § 9003(e)(2)(A).  In weighing the risk of harm, district courts "are not to engage in a custody determination, so '[it] is not relevant . . . who is the better parent in the long run, or whether [the absconding parent] had good reason to leave her home . . . and terminate her marriage.'"  *Walsh v. Walsh*,

---

[7]  "The 'grave risk' exception is to be interpreted narrowly, lest it swallow the rule." *Simcox v. Simcox,* 511 F.3d 594, 604 (6th Cir. 2007).

221 F.3d 204, 218 (1st Cir. 2000), quoting *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995).

*Stipulated Facts*

The following facts are stipulated by the parties.

1. The Petitioner lives in Santiago, Dominican Republic, and is a citizen of the Dominican Republic.

2. The Respondent lives in Methuen, Massachusetts.

3. The Petitioner and the Respondent were married on May 9, 2009, in the Dominican Republic.

4. The Petitioner and the Respondent are the parents of two children: D born in 2011, age 4, and K born in 2012, age 3.

5. The Respondent gave birth to Petitioner and Respondent's first child D in Lawrence, Massachusetts, in 2011.

6. The Respondent gave birth to Petitioner and Respondent's second child K in Lawrence, Massachusetts, in 2012.

7. Both children are under the age of sixteen.

8. On October 15, 2014, the Respondent traveled with both children from the Dominican Republic to Massachusetts.

9. Petitioner and Respondent were divorced in the Dominican Republic on April 22, 2015.

10. The children currently reside with the Respondent in Methuen, Massachusetts.

11. The children have not returned to the Dominican Republic from the United States since their arrival on October 15, 2014.

*Additional Factual Findings*

Based on the credible testimony and exhibits offered at the November 10, 2015 hearing, I make the following additional findings of fact.

Victor and Yalersi were married in their home village, Villa Tapia, in the Dominican Republic on May 9, 2009. This was a second marriage for Yalersi and a first for Victor, although he has nineteen-year-old twins, Ashley and Victor, Jr., from a prior relationship. Ashley lived with Victor and Yalersi and her half-sister D until 2013. She lives today with her father Victor. Victor, Jr. lives in Villa Tapia. Yalersi has a daughter by her first marriage, Sherley Bencosme, who is now a student at Middlesex Community College in Bedford, Massachusetts. Sherley lives with her mother and grandmother in Methuen.

Victor and Yalersi spent their married life at Residencial Blanca, Apartment E-4, in Cerros de Gurabo, Santiago. D was born to the couple on February 9, 2011; K was born on October 18, 2012. Just prior to giving birth to both children, Yalersi traveled to Lawrence, Massachusetts, where her mother then resided. After each child was born, she returned with them to the

Dominican Republic.[8]  D and K lived at Residencial Blanca from the time they were born until Yalersi took them to the United States on October 15, 2014.[9] Yalersi is a dual citizen of the Dominican Republic and the United States.  She and her children possess valid U.S. passports.

Victor works as manager in a financial company in Santiago.  He also owns an interest in a Gold's Gym in the nearby suburb of La Vega.  He previously owned a construction company in Santiago.  Yalersi provided coverage at Victor's office when he traveled for business.  Yalersi also owned a clothing boutique (Yalersi's Mansion of Couture) in the same building.

Prior to their divorce, the couple led a comfortable, upper middle class lifestyle supported by Victor's earnings from his various businesses.  According to Yalersi, for the first few years of the marriage she "had

---

[8] Yalersi testified that she gave birth to the children in Massachusetts to escape abuse by Victor.  I do not credit this testimony. I rather credit Victor's testimony that both parents believed that being born in the United States would confirm the children's U.S. citizenship and provide them greater opportunities when "it was time to go to college." Hrg. Tr. at 44.

[9] Victor continues to live at Residencial Blanca with Ashley.  He has preserved D's and K's bedroom as they left it.  Nov. 10, 2015 Hearing Transcript (Hrg. Tr.) at 66-67 ("[T]he bedroom still remains purple walls, purple headboards, pink sheets, pink rugs . . . a white dresser drawer, a lot of stuffed animals, . . . and D has pictures of her from school right on top of the dresser.").

everything."[10]  The couple took extended vacation trips together, including one for two weeks to Dubai (during which Yalersi's mother cared for D), as well as another to Madrid.  Towards the end of the marriage, Victor's construction business went bankrupt, and he was able to provide less for the upkeep of the household.

D and K were both baptized in the Dominican Republic and three of their four godparents live there. Records provided by the Baby Montessori School in Santiago confirm that D, the older of the girls, was enrolled for two years in the infant's program.  She had begun her first year of regular Montessori School when her mother relocated her to Methuen.[11] Pet'r Ex. 21. K, the younger daughter, had developmental challenges and had yet to begin school.  Both girls had playmates and extended family, including grandparents, aunts, uncles, and cousins, in the Dominican Republic.  The children were under the care of a local pediatrician and dentist.  Yalersi would

---

[10] Yalersi testified that in the United States "you have to do everything. . . . I have to clean.  I have to cook.  I have to provide everything for my kids.  In the Dominican Republic I had a driver.  I had a lady that cleans my house.  I had a nanny.  I had everything there." Hrg. Tr. at 92-93. The court notes that Cerros de Gurabo is one of the most desirable residential neighborhoods in Santiago.

[11] Yalersi testified that D attended the Montessori School "for a few months, not years, like [Victor] is saying."  Hrg. Tr. at 111.  She did admit, however, that in the Dominican Republic, because of the abundant household help, she spent less time with the children than she does today. Hrg. Tr. at 92-93.

tend to the children's medical appointments.  Victor would take the children out for meals, on swimming excursions, and to family gatherings each Sunday at his grandmother's home in Villa Tapia.

As the marriage deteriorated, the couple began to fight, at times in the presence of the children.[12]  Yalersi suspected Victor of having an affair with another woman.  She was also angry at his absences on business trips.[13]  Notwithstanding, the couple continued to live together with the children in Cerros de Gurabo.  After a heated quarrel at a family gathering at Victor's grandmother's home in early October of 2014, Yalersi obtained a restraining order against Victor and he moved out of the home.[14]  When Victor learned that Yalersi was at Residencial Blanca packing up the family furniture, he

---

[12] Yalersi's mother, Clara Lopez, testified that she had never seen Victor abuse Yalersi although she did not spend extensive time at their home.  Hrg. Tr. at 136.  Yalersi's oldest daughter, Sherley Bencosme, recalled a violent argument between Victor and her mother that began when Victor came home drunk.  According to Sherley, the argument ended with Victor hitting her mother.  Hrg. Tr. at 138-139.  She recalled a verbal altercation at Victor's grandmother's home and testified to seeing Victor at times with a gun (although never using it). She also claimed to have seen Victor punch Ashley "a couple of times."  *Id.* at 141-142.

[13] "Once he went supposedly to Ecuador for three months, and there was on[c]e that he went to Europe.  He never called me.  Seventeen days without calling me.  And then he appeared at my house saying, 'I couldn't use my phone.'" Hrg. Tr. at 87.

[14] According to Yalersi, Victor moved out of the home in July of 2014.  Hrg. Tr. at 88.  Victor testified that he moved out in October after Yalersi obtained the restraining order.  *Id.* at 13.

obtained a court order directing her to stop.[15]  On October 15, 2014, Yalersi boarded a flight to Boston with the two children.  She emailed a photo of the children to Victor prior to the plane taking off accompanied by a vulgarly worded text message telling Victor that he would never see his daughters again.  On March 5, 2015, Yalersi filed for divorce in the Civil and Commercial Chamber of the Court of First Instances in Santiago.[16]  In her divorce petition, Yalersi listed Santiago, Dominican Republic, as her domicile.[17]

---

[15] Yalersi explained that she had returned to the apartment after the fight at the grandmother's house, "because as you know, I always come here every time we fight. . . . So he saw me – because our furniture was white – he thought I was going to sell the furniture – so I was wrapping it with plastic so they wouldn't damage [it], because I was planning just to stay here.  So I hired a company to put plastic on the white leather." Nov. 10, 2015 Hrg. Tr. at 90. I find her explanation for hiring a moving company unbelievable.

[16] At the hearing, Yalersi's attorney presented a copy of what appears to be the divorce decree, which was entered by default on April 7, 2015 and recorded on April 22, 2015. According to the judgment, Yalersi instituted the proceeding and was represented by counsel when the petition was heard. Yalersi testified that neither she nor Victor were present at the hearing. Hrg. Tr. at 123. The decree purports to award "guardianship" of the children to Yalersi.  No explanation, however, is offered as to the legal meaning of "guardianship" under Dominican law or the effect under Dominican law of a judgment entered *ex parte*.  In any event, the copy of the decree is not authenticated as required by Fed. R. Evid. 902(3).  Victor testified that "[b]y law [he] had to wait until the divorce was over to file for joint custody or come to an agreement with [Ms. Gomez]," and that if the children are returned, "a judge [will] decide when and how I can see my daughters." Hrg. Tr. at 19.

[17] It is telling that during her testimony, Yalersi referred repeatedly to the Dominican Republic as "my country."  Her explanation was that "you

Yalersi's attorney included in her post-hearing filings a publication by the Department of State's Bureau of Diplomatic Security: *Dominican Republic 2014 Crime and Safety Report* (October 7, 2014), stating that kidnappings in the Dominican Republic are "prevalent" and have increased 32 percent (presumably over the prior year). Dkt 40-1 at 9. However, the Report's reference is to kidnappings for ransom, and not parental abductions. The Report also notes a general decrease in violent crime in the Dominican Republic and "a consolidation of political freedoms within [a] representational democracy with a series of generally free and fair elections." *Id.* at 6. The Department of State's Country Report on Human Rights Practices for 2014, while citing problems with corruption, notes improvements in the independence and functioning of the Dominican judiciary as well as respect by the government for civil rights and liberties. *See* http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2014&dlid=236684 (accessed Nov. 18, 2015).

*Ultimate Conclusions of Facts and Law*

Victor has established by a preponderance of the evidence that he had shared custodial rights over the children and was exercising them at the time

---

can even ask an American. That's how they [Dominicans] talk when your parents are Dominican." Hrg. Tr. at 110.

they were removed from the Dominican Republic. Victor also acted within his custodial rights by seeking a prompt return of the children under the Hague Convention.[18]

Yalersi has not shown by clear and convincing evidence that the children face the potential of a grave risk of harm should they be returned to the Dominican Republic. Whatever physical and verbal abuse Victor has inflicted on Yalersi (or vice-versa), there is no convincing evidence that he has ever harmed the children or has been anything other than an affectionate father to them (and D in particular).[19] While I agree that there is a genuine risk of psychological trauma for children who are exposed to their parents' verbal and physical abuse of one another, this risk is obviated by the fact that Victor and Yalersi are permanently divorced with no prospect of living together again. Thus, the alarm that Yalersi's attorney raises, that sending D and K to the

---

[18] Although Yalersi testified that Victor gave her written authorization in October of 2014 to take the children to Massachusetts, she recanted several questions later, admitting that "I don't have a paper that says it." Hrg. Tr. at 112. I credit Victor's testimony that he never gave permission for the children to be taken to the United States, nor did Yalersi ever discuss with him a desire to relocate with the children to the United States. As the attorney for the children points out, the right to give consent before the other parent takes a child to another country is a right of custody under the Hague Convention. Proposed Judgment, Dkt #35 at 2.

[19] Yalersi acknowledged in her testimony that during the first three months of the relocation of D to Massachusetts, she cried "every night and every day . . . [f]or her father." Hrg. Tr. at 117.

Dominican Republic will "once again [expose them] to physical and psychological harm because of [Victor's] violence towards their mother,"[20] is highly improbable.[21]

Any concerns about a risk to the children are further alleviated by the duty assumed by the Dominican Central Authority under the Hague Convention of seeing that the children receive appropriate care until a permanent custody decision is made by the Dominican courts.[22]

---

[20] Respondent's Closing Argument, at 1.  For this reason, and also because of my doubts about aspects of Yalersi's credibility on the subject, I part company with the advice of the attorney appointed to represent the children regarding the application of the Article 13(b) grave risk exception to return should apply.  Proposed Judgment, Dkt #35 at 5-11.  I do wish, however, to acknowledge the service performed by Attorneys Bassil and Thomas (on very short notice) for the children, mother, and the court.

[21] Victor has a criminal record in the United States, hence his deportation and inability to appear in person in a court in the United States.  Without diminishing its seriousness, I have given the record (which is under seal but part of this case) little weight as the offenses far predate the birth of D and K (and his marriage to Yalersi) and do not involve crimes of moral turpitude.  In any event, this court is not called upon, nor does it have the jurisdiction, to make a determination as to whether Victor or Yalersi is the more fit parent for custody purposes.

[22] That the relationship between Victor and Yalersi was tumultuous and involved reciprocal abuse, both verbal and physical, I have no doubt (as both parents in greater or lesser degree acknowledge).  Yalersi accused Victor of beating her regularly (including while she was pregnant), trying to choke her, pushing her down as she held D as a shield, punching her in the face, and putting a gun to her forehead after becoming drunk.  She also testified that he broke the arm of his sister in two places and that he would punch his daughter Ashley "twice a month," once so hard "that she couldn't go to school the next day."  Hrg. Tr. at 87.  According to Yalersi, Victor

In fixing the "last moment of the parents' shared intent," I look to the period immediately preceding Yalersi's unilateral decision to relocate the children to Methuen. It is abundantly clear that at the time, the parents considered themselves and the children as domiciled in the Dominican Republic.[23]

In making this determination, I have not given weight to the secondary factor of the children's acclimatization to their current place of residence in Methuen, given their ages, and the absence of any evidence that "unequivocally points to the conclusion that the [children have] acclimatized to the new location [in the United States] and thus [have] acquired a new

---

always carried a gun and that she had been present at Victor's farm when, after she found him with a woman, Victor and his father — "everybody got a gun. They started shooting, like, everywhere." *Id.* at 131. She also accused Victor of attempting to rape Ashley. *Id.* at 103. At the same time, she explained that when she married Victor, "I took her [Ashley] to live with us, because I want[ed] to have her father with her." *Id.* at 104. Ashley testified at the hearing that she has never accused her father of any crime and that she lives today with him in the family home in Cerros de Gurabo. *Id.* at 69-71. Yalersi's testimony is to be considered by the Dominican court in determining parental fitness and does not factor in this court's determination of habitual residence. Nonetheless, I have considered the testimony with respect to the "grave risk" exception. I have largely discounted it as I found it to gain in implausibility as Yalersi's accusations against her ex-husband escalated in tone and substance.

[23] The attorney appointed by the court to represent the children agrees that the Dominican Republic is their habitual residence. Proposed Judgment, Dkt. # 335, at 2.

habitual residence, notwithstanding any conflict with the parents' latest shared intent." *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005).[24]

ORDER

For the foregoing reasons, D and K will be returned expeditiously to the Dominican Republic. The parents are ORDERED to confer immediately with their attorneys and the attorney appointed by the court to represent the children, and with one another, to agree on the means of safely transporting the children to the Dominican Republic and for their temporary custody pending the entry of a permanent order by the Dominican courts. Until such time as the court approves the agreement (or issues an order of its own if the parties are unable to reach an agreement), the Order of October 23, 2015,

---

[24] In an attempt to demonstrate acclimatization of the children to their new circumstances in Methuen, Yalersi offers photos of a birthday party that she organized for K and of the girls dressed in Halloween costumes. She also testified to an outing with the children at Chuck E. Cheese. The court notes that all of these instances post-date the service on October 23, 2015, of the court's Order to appear for a hearing on Victor's petition, including the scheduling of K's birthday. Yalersi testified, "It was October 18, but I celebrate her birthday on a Sunday, the following Sunday, so it could be in Chuck E. Cheese's." Hrg. Tr. at 95. (October 18, 2015, K's actual birthday, was a Sunday). In any event, "a parent cannot create a new habitual residence by wrongfully removing and sequestering a child" in a new environment. *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001). Yalersi appears to have sought to isolate the children from any contact with Victor or his family, including his brother Alberto who lives in Lawrence, Massachusetts. Alberto testified that he had seen the girls only once in the nearly twelve months they have been in Massachusetts, "taking advantage that Yalersi was out of the country." Hrg. Tr. at 65.

forbidding any change in the current residence of the children in Methuen, without prior permission of the court, remains in effect.  The court asks the U.S. Department of State to notify the Dominican Central Authority (CONANI) of this decision and to request its assistance in coordinating the return of the children with the appropriate Dominican judicial authorities.  No costs or attorney's fees are awarded.

       SO ORDERED.

       /s/ Richard G. Stearns_____
       UNITED STATES DISTRICT JUDGE